RAFAEL MALAVÉ VÉLEZ ET AL., Plaintiffs and Appellees, *v.* HOSPITAL DE LA CONCEPCIÓN and SECURITY INSURANCE COMPANY, Defendants and Appellants.

No. R-70-259.     Decided June 14, 1971.

*Polo, Rivera Mercado & Lasa* and *Ulpiano Falcón Matos* for appellants. *R. Elfren Bernier* and *Plinio Pérez Marrero* for appellees.

MR. JUSTICE MARTÍNEZ MUÑOZ delivered the opinion of the Court.

We have carefully examined the original record of this case. We have given due consideration to the briefs and to the oral reports of the parties and dedicated considerable time to the reading of the transcript of the evidence. Above all, we have always borne in mind the well-deserved and meritorious deference to the distinguished trial judge in the delicate function corresponding to him of making his findings of fact by virtue of the sound and necessary rule of review consecrated in Rule 43.1 of the Rules of Civil Procedure. The study of the case has left in the mind of this Court the conviction that a manifest error has been committed by the trial court in weighing the evidence, which is the most delicate function corresponding to a court. *Román Montalvo* v. *Delgado Herrera*, 89 P.R.R. 419, 427 (1963).

It is evident that the trial court subscribed to a draft of the findings of fact and judgment submitted by the plaintiffs. We do not suggest that the practice, often followed by the trial courts, of requesting and receiving from the parties propositions as to the findings after the matters have been submitted to the judge for his adjudication, be discouraged. Like the presentation and use of written reports, these

measures serve to alleviate the enormous volume of work which falls upon the trial judges and may be of valuable help to the judge in the discharge of his delicate function of adjudicating the cases. It is unnecessary to remind that this is not a delegable function. Such propositions cannot substitute the dictates of the sound and wise opinion of the judge in his function of disclosing the truth. Insofar as there arise an extreme dependency of the judge on these propositions, particularly *ex parte* propositions, it is our duty to make a more detailed examination of the findings which are object of review. Judge Jerome N. Frank, of the Federal Court of Appeals, 2d Circuit, stated in *United States* v. *Forness*, 125 F.2d 928, 942 (2d Cir. 1942) :

"We stress this matter because of the grave importance of fact-finding. The correct finding, as near as may be, of the facts of a law suit is fully as important as the application of the correct legal rules to the facts as found. An impeccably 'right' legal rule applied to the 'wrong' facts yields a decision which is as faulty as one which results from the application of the 'wrong' legal rule to the 'right' facts. The latter type of error, indeed, can be corrected on appeal. But the former is not subject to such correction unless the appellant overcomes the heavy burden of showing that the findings of fact are 'clearly erroneous.' Chief Justice Hughes once remarked, 'An unscrupulous administrator might be tempted to say "Let me find the facts for the people of my country, and I care little who lays down the general principles."' That comment should be extended to include facts found without due care as well as unscrupulous fact-finding; for such lack of due care is less likely to reveal itself than lack of scruples, which, we trust, seldom exist. And Chief Justice Hughes' comment is just as applicable to the careless fact-finding of a judge as to that of an administrative officer. The judiciary properly holds administrative officers to high standards in the discharge of the fact-finding function. The judiciary should at least measure up to the same standards."

On this practice, see: Otis, *Improvements in Statement of Findings of Fact and Conclusions of Law*, 1 F.R.D. 83–87

(1940) ; 2B Barron and Holtzoff, *Federal Practice and Procedure* 491–495, § 1124; Note: *The Role of Counsel in Preparation of Special Findings of Fact: Roberts v. Ross, 344 F.2d 747 (3d Cir. 1965)*, 51 Cornell L.Q. 567–575; *United States v. El Paso Gas Co.*, 376 U.S. 651, 656–657 (1963) ; *In Re Las Colinas, Inc.*, 426 F.2d 1005 (1st Cir. 1970).

The source of liability imposed on appellee is found in the following finding of fact adopted by the court:

"We conclude that the sudden fall suffered by plaintiff was caused by reason that the floor was worn out in the area along which she was descending, but particularly, because it was very slippery on account of having become wet a short time before with water containing detergent (soap) used in said hospital for cleaning purposes."

Let us examine the evidence. Plaintiffs' evidence consisted of the testimony of the injured Francisca Rivera Malavé and that of her daughter María de las Nieves Malavé, who did not witness the accident. Mrs. Rivera Malavé testified that she is 58 years old, that she wears bifocals and that she was visiting on that day, Sunday, about 4 :00 p.m., together with her daughter and other relatives, her granddaughter, who was confined in one of the rooms of the second floor of Hospital de la Concepción in San Germán. After being there for some time she decided to follow her daughter María de las Nieves, who had gone down to look for some gifts that were in the automobile left in the parking lot. In relation to the fall, she testified, upon being examined by her attorney:

"A. I left after my daughter . . . she went to look for some gifts, but they had gone before, I remained downstairs and wanted to descend later on, I descended to the first landing when I stepped on the landing of the stairs, there I slipped and I went towards the side of the stairs I slipped near, when I fell down, I tried to hold on, but I slipped and fell towards the other side, to the other landing at the entrance." (Tr. Ev. p. 8.)

.     .     .     .     .     .     .     .

"A. The landing, here is the other stairway, *this one I*

*descended all right,* when I stepped here, when I put my foot on this stairway, I slipped, *I tried to hold on, but I could not,* and I fell down." (Tr. Ev. p. 9.)

.    .    .    .    .    .    .    .

"Q. And, Francisca, what caused your fall? Why did you fall?

A. Well, maybe *it was bad luck,* because I was descending all right, I live a normal life, peaceful, *I know I slipped, the floor was wet, that was it.*

Q. Nothing more." (Tr. Ev. pp. 18–19.) (Italics ours.)

It is proper to emphasize the fact that when Francisca was being cross-examined she was confronted with a sworn statement offered by her in a deposition prior to the trial. The incident appears from pages 24 to 25 of the transcript of evidence.

"Mr. Polo:

I asked you here, when you said that it was shiny, I asked you, do you mean that it was waxed, that it was polished, or that there was water or some kind of peels, and you answered, 'I could not notice it, I know it was shiny', how do you know it was shiny, if you could not notice it?

A. Well, I saw it shiny and in that condition, when I was descending and then I fell down.

Q. When you were descending, did you see it was shiny and wet?

A. *I know that it was as if it had been polished.*" (Italics ours.)

It seems obvious that Francisca's testimony cannot serve as the basis, by itself, for the determination of the court in the sense that the floor was *somewhat worn out, very slippery,* nor that "it had become wet a short time before with water containing *detergent* (soap)."

The next witness for appellees was Francisca's daughter. She did not witness the accident. Upon examination by her attorney the witness stated:

"Q. In what condition was that stairway?

A. Going up in a group I did notice that it was somewhat slippery, as if it were waxed, when I descended, I always have the precaution to use the handrails, some time had elapsed when I descended, it continued as if it were waxed, shiny and slippery, it was somewhat slippery." (Tr. Ev. p. 29.)

.    .    .    .    .    .    .    .

"A. Immediately they called me, I was accompanied by my two cousins . . . . I went to see the stairway immediately, after I saw the stairway, I left my mother with my uncle and the girls and went to see the stairway and it was wet, it was quite wet.

Q. Do you know whether you saw any person from the hospital who was performing any cleaning operation?

A. Yes, sir; they were cleaning, it seems that when we arrived at the hospital they were cleaning." (Tr. Ev. p. 30.)

.    .    .    .    .    .    .    .

"Witness:

They were cleaning, when I descended they were cleaning the first floor of the hospital.

Mr. Pérez:

Q. How were they cleaning it?

A. With a mop." (Tr. Ev. p. 31.)

Later on, when she was cross-examined by appellants' attorney, she testified:

"Q. When you arrived, that you say they were cleaning, what specific place were they cleaning?

A. First floor.

.    .    .    .    .    .    .    .

Q. And were they polishing it with a polishing machine?

A. They were mopping.

Q. How many persons?

A. One.

Q. Man or woman?

A. It was a man.

Q. You did not see that being done in the stairway?

A. No, sir." (Tr. Ev. pp. 37–38.)

The testimony of the injured party, Francisca Rivera, and of her daughter, María de las Nieves Malavé, constitute all

the oral evidence for the plaintiffs. As part of their evidence, two photographs of the stairway taken by María de las Nieves on the day after the occurrence of the accident were admitted in evidence (Tr. Ev. p. 29). Appellants offered, and were also admitted in evidence, two photographs of the stairway. The photographs offered by both parties show that the stairway was all covered with a material having transversal grooves or strias, whose purpose, evidently, is to avoid a smooth surface propitious to falls. Furthermore, it had two handrails, one on each side. The court did not make any finding on that particular. But it did make a finding to the effect that the stairway was *very slippery* because it had become wet a short time before "with water containing detergent (soap) used in said hospital for cleaning purposes."

It seems clear to us that the testimony of the injured lady and her daughter do not support said finding. The injured lady testified, as we have seen, that down to "the landing she *had descended all right*" and that *"when I fell here, when I put my foot on this stairway, I slipped, I tried to hold on but I could not. . . ."* And when she was asked by her attorney what was the cause of her fall she answered ". *. . I know I slipped, the floor was wet, that was it."* (Tr. Ev. pp. 18–19.) (Italics ours.) Her daughter testified that the stairway "was shiny . . . somewhat slippery . . ., wet, quite wet." (Tr. Ev. pp. 29–30.)

The judgment appealed from relies on the alleged presence of a liquid detergent mixed with water, utilized by the hospital for the cleaning performed a short time before, which created a *very* slippery condition on the stairway. Reference to the detergent only appears by word of witness Eliseo Borrero, manager of the hospital. To questions posed by appellants, said witness testified that the cleaning of the floor and the stairs is done every day between six and seven in the morning, when there are no visitors around, utilizing an industrial detergent diluted in water, generally used in

the hospitals (Tr. Ev. p. 78), and then it is wiped with a "very dry" mop (Tr. Ev. p. 83), and that during the visiting hours such cleaning operation is not done, except gathering papers and cigarette stubs from the floor (Tr. Ev. p. 10).

The finding as to the presence of the detergent, as the factor of liability in this case, is not the most logical and rational, nor the most fair. The accident occurred on a Sunday, about 4:30–5:00 in the afternoon, during visiting hours. It seems improbable that the hospital adopted these cleaning measures during the hours in which, precisely, because the hospital is open to the public, it would be more onerous for the visitors, the public in general, and the hospital, against its natural interests in attaining better result without exposing the visitors to unfortunate accidents which said operation could cause. From an entire testimony, the court picked out the use of the detergent and placed it out of the context of the witness' testimony, as a determining factor of liability.

The trial court committed a manifest error in weighing the evidence. The daughter of the injured lady testified, upon examination by the judge, that around two or two hours and a half after the accident she had spoken to one of the nuns, whose name she could not recall, who did charity work in the hospital, and she had informed her that the border of the stairs was "worn out" (Tr. Ev. p. 43). One of these nuns, Sor María Díaz, testified at the trial. She said that she was the Head Nurse; she had knowledge of the accident a short time after its occurrence; she examined the stairway, she found it dry and clean (Tr. Ev. p. 52). This witness testified that the injured lady's daughter had alleged that "the stairs were worn out" (Tr. Ev. p. 53). The injured lady's daughter did not testify anything about her having complained to the nun as to the condition of humidity of the stairs. Appellees' answers to appellants' written interrogatories in relation to the circumstances of the accident, maintenance of the stairs,

etc., do not inform either about the condition of humidity of the stairs as a factor or basis of liability.[1]

■ A glance at the recent case law concerning falls on stairs, shows that we act in these cases with particular minuteness in the discharge of our reviewing function. When dealing with falls on stairs, it is natural that it be so. As it was stated in *Santaella* v. *Licari*, 83 P.R.R. 855, 868 (1961):

"... The existence of a stairway on which a person must tread is apparent and obvious and it is to be presumed that a person shall exercise prudence and care in going up or down the stairs."

Thus, for example, in *Weber* v. *Mejias*, 85 P.R.R. 72, 76 (1962), after a careful examination of the record we reversed the judgment, dismissing the complaint, and we held that although we had before us a "difficult" case, it is proper to emphasize that the surface of the steps was smooth, that together with an open construction, it tended to make them slippery when they became wet from the rain.

In *Torres* v. *Metropolitan School*, 91 P.R.R. 1, 6–7 (1964), in reversing a judgment imposing liability on defendant— the tiles in the stairway were completely smooth and the stairs had only one handrail—we held that:

"... Defective stairways, for the purpose of imposing liability in these cases, are those whose steps are worn down, broken, have holes, are cracked, loose, have protruding nails or screws, or whose size or shape is irregular, worn down, smooth as glass, and very slippery."

In *Ferro* v. *M.B.A.*, 91 P.R.R. 748 (1965), a lady suffered a fall when alighting from a bus. The trial court determined that the accident occurred because the exit steps of the bus in question were made of metal, had over 4 years of use, were fairly worn out, and did not have the protecting rubber

---

[1] During the hearing before us, appellees' attorney acknowledged that the factor of the "wearing-out" of the stairs was not sufficient as a basis for liability. Actually, it is so. The evidence as to this point was extremely vague and inaccurate to serve as support for a determination of liability.

matting like other buses of said Authority, as a result of which circumstances plaintiff slipped when she put her foot on the last step and fell forward on the sidewalk. On reversal we held at p. 749:

"The evidence previously recited is insufficient to establish that the steps were smooth, especially if it is considered that the defendant presented in evidence some photographs of the steps which show that the latter had grooves and were not smooth or worn out. The absence of rubber matting on the steps does not constitute negligence; they may be safe without being protected by rubber matting where, as in the present case, they have grooves for the purpose of preventing a completely smooth surface propitious to falls."

In *Feliciano* v. *Escuela de Enfermeras*, 94 P.R.R. 509 (1967), it was established by defendants' own evidence that the floor's surface was extremely smooth and slippery even when dry. Relying mainly on said evidence, we sustained the judgment of conviction. And notwithstanding the existence of said evidence for defendants, four Justices voted for reversal, sustaining in their dissenting opinion at p. 520:

"Without dispute, appellee sought to establish that she slipped on water for two reasons, that is to say (1) in order to make her case similar to that of *Weber, supra;* and (2) because the evidence in the sense that the floor was slippery, to the point of being dangerous was extremely weak and inaccurate since the two witnesses aforementioned only said on cross-examination that it was slippery 'to a certain point' or 'at times'. On the other hand, the evidence was clear and final that the floor was not wet. There was no circumstance at all to justify any similarity between this case and that of *Weber, supra.*"

The judgment appealed from will be reversed.

Mr. Chief Justice Negrón Fernández and Mr. Justice Hernández Matos did not participate herein.